# EXHIBIT H

Trials@uspto.gov
Tel: 571-272-7822

Paper 37
Entered: September 24, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.,
Petitioner,

v.

MPH TECHNOLOGIES OY,
Patent Owner.

---

IPR2019-00819
Patent 7,620,810 B2

---

Before KAMRAN JIVANI, JOHN D. HAMANN, and
STACY B. MARGOLIES, *Administrative Patent Judges.*

HAMANN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2019-00819
Patent 7,620,810 B2

## I.    INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, Apple Inc. ("Petitioner") challenges the patentability of claims 1–7 ("the challenged claims") of U.S. Patent No. 7,620,810 B2 (Ex. 1001, "the '810 patent"), owned by MPH Technologies Oy ("Patent Owner").  We have jurisdiction under 35 U.S.C § 6.  This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons discussed herein, we determine that Petitioner has not shown by a preponderance of the evidence that claims 1–6 are unpatentable, but Petitioner has shown by a preponderance of the evidence that claim 7 is unpatentable.

## II.    BACKGROUND

### A.  Procedural History

Petitioner filed a Petition requesting *inter partes* review of the challenged claims of the '810 patent.  Paper 2 ("Pet.").  The Petition is supported by the Declaration of David Goldschlag, Ph.D. (Ex. 1002).  Patent Owner filed a Preliminary Response.  Paper 8.

We instituted *inter partes* review of all of the challenged claims of the '810 patent on all of the grounds raised in the Petition.  Paper 10 ("Dec. on Inst."), 7, 40.  As to this Decision on Institution, Patent Owner filed a Request for Rehearing, and requested review by the Precedential Opinion Panel ("POP").  Paper 13; Ex. 3001.  Patent Owner's request for POP review was denied, and we subsequently denied Patent Owner's Request for Rehearing.  Papers 16, 24.

Patent Owner filed a replacement Response to the Petition.  Paper 23 ("PO Resp.").  The Response is supported by the Declaration of Professor

IPR2019-00819
Patent 7,620,810 B2

George N. Rouskas, Ph.D. (Ex. 2003). Petitioner filed a Reply to Patent Owner's Response. Paper 26 ("Pet. Reply"). The Reply is supported by an additional Declaration of David Goldschlag, Ph.D. (Ex. 1020). Patent Owner filed a Sur-Reply to Petitioner's Reply. Paper 29 ("PO Sur-Reply").

An oral hearing was held on June 25, 2020. A transcript of the oral hearing is included in the record. Paper 36 ("Tr.").

### B. Related Matter

The parties identify *MPH Techs. Oy v. Apple Inc.*, No. 5:18-cv-05935-PJH (N.D. Cal.), as a matter that may affect or would be affected by a decision in this proceeding. Pet. 2–3; Paper 7, 1. The parties also identify, as a related matter, *Apple Inc. v. MPH Techs. Oy*, IPR2019-00820 (PTAB), involving U.S. Patent No. 7,937,581, which claims the benefit of the '810 patent's filing date. Pet. 2–3; Paper 7, 1.

### C. The Challenged Patent (Ex. 1001)

The '810 patent relates to "secur[ing] mobile connections in telecommunication networks." Ex. 1001, 1:13–14. In particular, the '810 patent describes reducing the handover latency and computational overhead for secure connections, such as those employing Internet Protocol ("IP") Security ("IPSec") with mobile terminals[1] (i.e., terminals that can move from one network to another). *Id.* at 1:13–15, 1:57–64, 4:10–31, 6:48–50, 7:28–42, 10:34–42.

---

[1] The '810 patent discloses that "the term[s] mobility and mobile terminal do[] not only mean physical mobility, . . . [but also] mean[] moving from one network to another, which can be performed by a physically fixed terminal as well." Ex. 1001, 4:27–31.

IPR2019-00819
Patent 7,620,810 B2

IPSec comprises a set of rules defined by the Internet Engineering Task Force ("IETF") to "provide[] the capability to secure communications between arbitrary hosts," according to the '810 patent. *Id.* at 1:57–64, 2:3, 2:6–10. The '810 patent states that these rules describe, *inter alia*, providing "access control based on the distribution of cryptographic keys." *Id.* at 2:11–20. The '810 patent also describes the concept of a Security Association ("SA"), which according to the '810 patent is "a one-way relationship between a sender and a receiver that offers [negotiated] security services to the traffic carried on it." *Id.* at 2:21–24.

The '810 patent discloses that IPSec supports two modes of operation (i.e., transport mode and tunnel mode). *Id.* at 3:8–9. "Typically, transport mode is used for end-to-end communication between two hosts." *Id.* at 3:10–13. "Tunnel mode . . . is generally used for sending messages through more than two components," such as "when one or both ends of a SA is a security gateway, such as a firewall or a router that implements IPSec." *Id.* at 3:16–21.

"IPSec is intended to work with static network topolog[ies]," according to the '810 patent. *Id.* at 4:10–11. For example, IPSec can secure communications between hosts across a local area network ("LAN"), as well as across a private or public wide area network ("WAN"). *Id.* at 1:57–59. Figure 1, shown below, "illustrates an example of a telecommunication network to be used in the invention" of the '810 patent. *Id.* at 8:40–41.

4

IPR2019-00819
Patent 7,620,810 B2



## FIG. 1

Figure 1 depicts an example telecommunication network comprising "computer 1 . . . and computer 2[,] a destination computer, to which the secure messages are sent . . . by means of an IPSec tunnel established between computer 1 and computer 2." *Id.* at 8:54–58.  The '810 patent adds: "Computer 2 [can] be a security gateway for a third computer 3.  Then, the messages sent from computer 2 to computer 3 are sent in plaintext." *Id.* at 8:53–60.

The '810 patent discloses that in forming an IPSec tunnel under IPSec's default automated key management protocol (i.e., the Internet Key Exchange ("IKE") protocol), "the tunnel endpoints are fixed and remain constant." *Id.* at 3:66–4:4, 4:12–17.  The '810 patent adds:  "If IPSec is used with a mobile host the IKE key exchange will have to be redone from every new[ly] visited network.  This is problematic, because IKE key exchanges involve computationally expensive" calculations and require exchanging numerous messages between the endpoints, leading to higher latency.  *Id.* at 4:15–26.

To address these problems, the '810 patent discloses avoiding a full re-negotiation between the tunnel endpoints, when computer 1 moves

IPR2019-00819
Patent 7,620,810 B2

networks. *E.g.*, *id.* at 9:33–44 (describing prior art requires a full re-negotiation), 9:63–66. More specifically, the '810 patent discloses initially establishing an IPSec tunnel between computer 1 (address A) and computer 2 (address X) using IKE, as in the prior art. *Id.* at 9:48–62, Fig. 5 (illustrating steps 1a–9a for setting up the tunnel); *compare id.* at Fig. 5, *with id.* at Fig. 4 (showing the same nine steps as the prior art solution); *see also id.* at 9:12–39 (describing the prior art IKE establishment of the tunnel).

The '810 patent discloses that, when computer 1 moves from address A to address B, computer 1 sends from its new address (address B) to computer 2 (address X) at the other end of the established IPSec tunnel, a request for computer 2 to register its new address. *Id.* at 9:63–10:2. According to the '810 patent, this request can be "encrypt[ed] and/or authenticat[ed] . . . us[ing] the same IPSec SA [that is used] for protecting both data and registration traffic." *Id.* at 10:4–8.

The '810 patent thus discloses that the tunnel's IPSec SA is carried over to the new connection point, and computer 1 can send IPSec-protected messages to computer 2 after sending the request, which "essentially makes the handover latency zero." *Id.* at 10:11–19, 10:34–37. "[T]he exact method of signalling is not important[;] the essence is to carry over the IPSec SA to the new connection point." *Id.* at 10:11–13.

### D. The Challenged Claims

Petitioner challenges claims 1–7 of the '810 patent, of which claims 1 and 7 are independent. Claims 1 and 7 are reproduced below:

> 1. A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

IPR2019-00819
Patent 7,620,810 B2

a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway,

b) the mobile terminal changing from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway,

in response to the request message from the mobile terminal, the security gateway changing an address definition of the secure connection from the first address to the second address, the mobile terminal sending a secure message in the secure connection from the second address of the mobile terminal to the other terminal via the security gateway,

the secure connection being established by forming a Security Association (SA) using IPSec protocols, and the request message and/or a reply message being encrypted and/or authenticated by using the same SA already established.

Ex. 1001, 10:48–11:8.

7. A method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween, the method comprising:

a) establishing a secure connection between a first address of the mobile terminal and an address of the security gateway,

the secure connection defined by at least the addresses of the mobile terminal and the security gateway,

b) the mobile terminal moving from the first address to a second address,

c) while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway,

IPR2019-00819
Patent 7,620,810 B2

> the security gateway changing an address definition of the
> secure connection from the first address to the second address,
> and
>
> the other terminal sending a secure message in the secure
> connection to the second address of the mobile terminal via the
> security gateway.

Ex. 1001, 12:1–22.

### E. Instituted Grounds of Unpatentability

We instituted trial based on the following grounds of unpatentability,

which are all the grounds of unpatentability raised in the Petition:

| | References | Basis[2] | Challenged Claim(s) |
|---|---|---|---|
| 1. | Ishiyama,[3] Murakawa[4] | § 103(a) | 1, 4, 5, 7 |
| 2. | Ishiyama, Murakawa, Ahonen[5] | § 103(a) | 2, 3 |
| 3. | Ishiyama, Murakawa, Forslöw[6] | § 103(a) | 6 |

Pet. 4, 12–69.

## III.   LEVEL OF ORDINARY SKILL IN THE ART

To determine whether an invention would have been obvious at the

time it was made, we consider the level of ordinary skill in the pertinent art

at the time of the invention.  *Graham v. John Deere Co.*, 383 U.S. 1,

17 (1966).  In assessing the level of ordinary skill in the art, various factors

---

[2] The Leahy-Smith America Invents Act ("AIA") included revisions to
35 U.S.C. § 103 that became effective on March 16, 2013.  Because the '810
patent issued from an application filed before March 16, 2013, we apply the
pre-AIA version of the statutory basis for unpatentability.
[3] U.S. Patent No. 6,904,466 B1 (issued June 7, 2005) (Ex. 1004).
[4] U.S. Patent No. 7,028,337 B2 (issued Apr. 11, 2006) (Ex. 1005).
[5] U.S. Patent No. 6,976,177 B2 (issued Dec. 13, 2005) (Ex. 1006).
[6] U.S. Patent No. 6,954,790 B2 (issued Oct. 11, 2005) (Ex. 1007).

IPR2019-00819
Patent 7,620,810 B2

may be considered, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)). "[O]ne or more factors may predominate." *Id.*

In our Decision on Institution, we adopted Petitioner's proposed definition for one having ordinary skill in the art at the time of the invention of the '810 patent as one who "would have had a B.S. degree in Computer Engineering, Electrical Engineering, or an equivalent field, as well as at least 3–5 years of academic or industry experience in the Internet security industry." Pet. 12 (citing Ex. 1002 ¶¶ 20–21). Patent Owner does not dispute our adoption of Petitioner's definition, nor otherwise address the level of ordinary skill at the time of the invention of the '810 patent. *See generally* PO. Resp.

Because Petitioner's definition of the level of skill in the art is consistent with the '810 patent and the asserted prior art, we maintain Petitioner's definition for purposes of this Final Written Decision. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *GPAC*, 57 F.3d at 1579; *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978). We apply Petitioner's definition in our analysis below.

IV.   CLAIM CONSTRUCTION

Because the Petition was filed after November 13, 2018, we construe the challenged claims by applying "the standard used in federal courts, in other words, the claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b), which is articulated in

IPR2019-00819
Patent 7,620,810 B2

*Phillips* [*v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)]." *See* Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340, 51,340, 51,358, 51,343–44 (Oct. 11, 2018) (amending 37 C.F.R. § 42.100(b) effective November 13, 2018) (now codified at 37 C.F.R. § 42.100(b) (2019)).  Under *Phillips*, the words of a claim are generally given their "ordinary and customary meaning," which is the meaning they would have to a person of ordinary skill in the art at the time of the invention, in light of the specification and prosecution history.  *See Phillips*, 415 F.3d at 1312–13.

Petitioner does not submit any terms for construction.  Pet. 12 (arguing that "[a]ll claim terms of the '810 patent should receive their ordinary and customary meaning").  Patent Owner submits the term "security gateway" for construction, and argues that its meaning is in dispute.  PO Resp. 11–24.  To show a dispute, Patent Owner quotes from our Decision on Institution where we preliminarily found that (i) "Petitioner argues that one of ordinary skill in the art would have understood that Ishiyama's 'correspondent [host]' would be a security gateway," and (ii) "there [wa]s sufficient support in the [preliminary] record that Ishiyama's correspondent host is a security gateway."  PO Resp. 11 (citing Dec. on Inst. 25, 33).  Patent Owner argues "[t]hus, the claim construction dispute in this proceeding is whether a correspondent host is a 'security gateway.'"  *Id.*

For our analysis below, however, we do not rely on Petitioner's arguments that Ishiyama's correspondent host is a security gateway.  Rather,

we consider Petitioner's alternative argument[7] that Murakawa teaches a security gateway in our analysis of challenged claim 7; the remaining challenged claims are addressed without implicating this claim term.  Thus, we conclude that no express claim construction is necessary to determine whether Petitioner has shown by a preponderance of evidence that the challenged claims are unpatentable.  *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'").

V.    PRINCIPLES OF LAW

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the art.  *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of non-obviousness, if present.[8]  *See Graham*, 383 U.S. at 17–18.  When evaluating a claim for obviousness, we also must "determine whether there

---

[7] "Petitioner alternatively relies on Ishiyama's teachings combined with Murakawa's teachings of a 'security gateway configuration' (e.g., 'a security gateway' and 'another terminal') for disclosing claim 1."  Dec. on Inst. 24; *see also* Pet. 12–54.

[8] Patent Owner does not present arguments or evidence of such objective evidence of non-obviousness in its Response.  *See generally* PO Resp.

IPR2019-00819
Patent 7,620,810 B2

was an apparent reason to combine the known elements in the fashion
claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*,
441 F.3d 977, 988 (Fed. Cir. 2006)).

## VI.   ALLEGED OBVIOUSNESS OVER ISHIYAMA AND MURAKAWA

Petitioner argues that the combination of Ishiyama and Murakawa
renders claims 1, 4, 5, and 7 of the '810 patent obvious under 35 U.S.C.
§ 103(a).  Pet. 12–59.  We have reviewed the parties' arguments and the
evidence of record.  For the reasons that follow, we determine that Petitioner
(1) fails to show by a preponderance of the evidence that claims 1, 4, and 5
would have been obvious to one of ordinary skill in the art in view of
Ishiyama and Murakawa; and (2) shows by a preponderance of the evidence
that claim 7 would have been obvious to one of ordinary skill in the art in
view of Ishiyama and Murakawa.

### A. Summary of Ishiyama

Ishiyama relates to improving a mobile computer's "capab[ility] of
carrying out communications while moving among a plurality of inter-
connected networks." Ex. 1004, 1:9–11.  In furtherance of this mobility,
Ishiyama discloses having the mobile computer notify its correspondent host
(i.e., the host at the other end of a communication) of its new address when
the mobile computer moves networks. *E.g.*, *id.* at 3:43–67, 6:13–18, 15:37–
16:10.  The mobile computer makes this notification by changing the source
address of an outer packet of an encapsulated packet to the mobile
computer's new address before sending the packet to the correspondent host.
*Id.*  When the correspondent host receives the packet from the mobile
computer, the correspondent host detects the address change and updates its

IPR2019-00819
Patent 7,620,810 B2

stored information to reflect the new address for the mobile computer. *E.g.*, *id.* at 3:9–14.

Figure 4, shown below, is a schematic diagram illustrating a mobile computer changing locations in an exemplary configuration of a mobile communication system, in accordance with an embodiment of Ishiyama's invention. *Id.* at 5:5–7, 5:11–13.

## FIG. 4



Figure 4 "shows an exemplary situation in which a packet is transferred from mobile computer 2 to . . . correspondent host 3 using [an] IPSEC tunnel." *Id.* at 8:33–35. Initially, mobile computer 2 communicates with correspondent host 3 via an IPSec tunnel, with mobile computer 2's address (CoA1) indicating its endpoint of the tunnel. *Id.* at 8:43–49. In other words, "mobile computer 2 transmits an encapsulated packet in which the outer packet has the source address='CoA1' and the destination address='CN.'" *Id.* at 8:50–54. As shown, when mobile computer 2 moves, its address changes from CoA1 to CoA2. *Id.* at 8:55–58, Fig. 4 (showing that mobile computer 2 moves networks). To convey this change, mobile

IPR2019-00819
Patent 7,620,810 B2

computer 2 changes the source address of the outer packet to CoA2 and transmits the packet to correspondent host 3 via the IPSec tunnel. *Id.* at 8:59–63, Fig. 4. Correspondent host 3 detects this change in mobile computer 2's address, and replaces the CoA1 address with CoA2 in its database for the IPSec tunnel. *Id.* at 8:66–9:4; *see also id.* at Figs. 9B, 9D (showing the update of the address in correspondent host 3's SA database), 12:51–59. Ishiyama discloses that the other SA information "remain[s] unchanged, so that there is no need to re-negotiate keys for IPS[ec] encryption and authentication." *Id.* at 9:5–10.

   B. *Summary of Murakawa*

   Murakawa relates to allowing a PC outside a LAN to be virtually regarded as a PC on the LAN and communicate with a terminal on the LAN. Ex. 1005, 1:16–24, 3:62–65. Specifically, Murakawa discloses allowing an outside terminal to communicate (via a WAN, a security gateway, and a LAN) with a terminal on the LAN. *Id.* at 1:11–24, 3:61–4:16.

   Petitioner's annotated version of Murakawa's Figure 5, which illustrates a "prior art typical network system," *id.* at 4:32–33, is shown below.

IPR2019-00819
Patent 7,620,810 B2



Murakawa's Figure 5 above shows a "prior art typical network system" and is further annotated by Petitioner to add labels for a mobile terminal, security gateway, and other terminals.  Pet. 28.  According to Murakawa, Figure 5 "is a block diagram of a typical network system including a WAN."  Ex. 1005, 1:51–53.  As shown in Figure 5, the network system includes "PC 101 [(labeled by Petitioner as 'Mobile Terminal')], which is located outside . . . LAN [104 and] establish[es] a dialup connection to the provider, WAN 102, and security gateway 103 [(labeled by Petitioner as 'Security Gateway')] that connects WAN 102 and LAN 104." *Id.* at 1:54–58.  In addition, "LAN 104[,] being subjected to security gateway 103[,] includes . . . client PCs 106, 107" (labeled by Petitioner as "Other Terminals").  *Id.* at 1:59–60.  Also shown is virtual private network ("VPN") 108, which is established between PC 101 and security gateway 103 to perform IPSec communication.  *Id.* at 1:61–63.  Murakawa discloses

15

that this network system ensures safe communications between PC 101 and the terminals on LAN 104.  *Id.* at 2:1–4.

### C. Challenged Claim 1

Among independent claim 1's limitations is a "mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway."  Ex. 1001, 10:59–63.  Claim 1 further recites "*the request message* and/or a reply message *being encrypted* and/or authenticated by using the same SA already established."  *Id.* at 11:5–8 (emphases added).  Petitioner does not argue, however, that the combination of Ishiyama and Murakawa teaches "a reply message," or that the request message is "authenticated."  *See* Pet. 45–47; Pet. Reply 18–19; Tr. 25:8–26:22.  Hence, we focus on the request message being encrypted.

As we discuss below, we agree with Petitioner that Ishiyama teaches a request message.  *See* Pet. 35–37.  However, we find that Petitioner fails to show that Ishiyama teaches the request message is encrypted, for which Petitioner relies solely on Ishiyama to teach.

First, we agree with Petitioner and find that Ishiyama teaches that after a mobile terminal moves from a first address (CoA1) to a second address (CoA2), the mobile terminal sends a *request message* to the address of the correspondent host to change the security association definition from CoA1 to CoA2.  Ex. 1004, 8:59–65; Pet. 35.  Specifically, Ishiyama teaches that "the mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2.'"  Ex. 1004, 8:59–62; Pet. 35.  We agree

16

IPR2019-00819
Patent 7,620,810 B2

with Petitioner that Ishiyama teaches that "the encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred."  Ex. 1004, 8:63–65; Pet. 35.  This is shown in Ishiyama's Figure 4, shown below as annotated in the Petition.  *See* Pet. 36 (providing annotated Figure 4).

FIG.  4



Annotated Figure 4 "is a schematic diagram for explaining operations in the case where the mobile computer changes a connected location in the mobile communication system," with (i) a dotted-line red box around mobile computer 2 at its first location, (ii) a solid-line red box around mobile computer 2 at its second location, (iii) a solid-line green box around correspondent host 3, (iv) a "Mobile Terminal" label for each mobile computer 2 location, and (v) a "Security Gateway" label for correspondent host 3.  Ex. 1004, 5:11–13; Pet. 36 (annotating Ex. 1004, Fig. 4).  Ishiyama's Figure 4 illustrates that after the mobile computer 2 moves to a second address, a request message is sent from mobile computer 2 to correspondent host 3, with the request message illustrated as a rectangle (with "src: Haddr" and "dst: CN" labels) depicting the encapsulated packet,  surrounded by a larger rectangle, depicting the outer packet (with "src: CoA2" and "dst: CN"

17

labels). Ex. 1004, Fig. 4, 8:59–65; Pet. 35–36. Thus, Ishiyama teaches the entire transmitted packet comprises the request message. *Id.* at 8:59–65, Fig. 4. This finding is consistent with Petitioner's arguments made during the oral hearing that Ishiyama's entire transmitted packet (i.e., the encapsulated packet plus the outer packet, which has the changed source address) is the claimed request message. *See, e.g.*, Tr. 27:23–28:4, 29:10–17, 30:3–11, 34:14–35:1, 40:12–14, 65:8–67:7.

Second, we agree with Petitioner and find that Ishiyama teaches that the "[r]equest [is] for changing the security association to the correspondent [host]" as part of mobile computer 2 performing a SA Gateway Update. Pet. 36 (quoting Ex. 1004, 11:39–40); Ex. 1004, 11:39–46. More specifically, Ishiyama teaches that mobile computer 2's "request [is] to change the previous CoA used as the destination in the security association into the current CoA." Ex. 1004, 11:43–45; *see also* Pet. at 36–37 (annotating Ex. 1004, Fig. 7; citing Ex. 1004, 12:54–57 (arguing that "[t]he SA Gateway Update operation is depicted as operation (5) in Figure 7")). In other words, Ishiyama teaches that the request message is sent to request that the correspondent host change the secure connection so as to be defined between the mobile computer's second address and the address of the correspondent host. *See, e.g.*, Ex. 1004, 11:39–45, 12:54–60, Fig 7; Pet. 36–37. "As a result of these operations, at the correspondent [node] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all the security associations is changed to the current CoA 'CoA2.'" Ex. 1004, 12:66–13:3; Pet. 37.

IPR2019-00819
Patent 7,620,810 B2

Petitioner, however, fails to show that Ishiyama's request message is encrypted, as required by claim 1. Petitioner instead focuses on only a portion of Ishiyama's request message (i.e., the encapsulated packet) in arguing that Ishiyama teaches that the request message is encrypted. *See* Pet. 45–46; Pet. Reply 18. For example, Petitioner argues that "[r]egarding the encryption of the request message, Ishiyama explains that the mobile computer 2 includes 'an encryption unit 114 for carrying out the encapsulation and encryption on transmission packets.'" Pet. 45–46 (quoting Ex. 1004, 13:40–41; citing Ex. 1004, 13:33–35). "Indeed a main requirement and pillar of IPsec is to encrypt messages," according to Petitioner. *Id.* at 46 (citing Ex. 1011, 4 at § 2.1, 6–7 at §§ 3.1–3.2). Moreover, Petitioner argues that "Ishiyama explains that '[i]n the tunnel mode IPSEC communications, the packet encapsulation and the encryption/decryption of the inner packet are carried out and the IPSEC module 22 [of mobile unit 2] has functions for realizing such encapsulation and encryption/decryption processing.'" Pet. Reply 18 (quoting Ex. 1004, 7:56–60). "The mobile unit then uses this IPSEC module to transmit an 'encapsulated packet' via the IPSEC tunnel to update the address at the other endpoint," according to Petitioner. *Id.* at 18–19 (citing Ex. 1004, 8:55–9:10). Petitioner argues that "[b]y using IPSec to perform the update, the packet and the request message are encrypted." *Id.* at 19 (citing Ex. 1020 ¶¶ 60–62; Ex. 1011, 4 at § 2.1, 6–7 at §§ 3.1–3.2). Petitioner adds that Patent Owner's expert, "Dr. Rouskas[,] even confirmed this during his deposition." *Id.* (citing Ex. 1019, 175:19–176:2 (Dr. Rouskas testifying "[s]o, yes, the payload of that packet is encrypted")).

IPR2019-00819
Patent 7,620,810 B2

None of the passages that Petitioner cites for this limitation, however, teach that the request message's outer packet's source address is encrypted. Rather, Ishiyama only teaches that the encapsulated packet (payload) is encrypted. *E.g.*, Ex. 1004, 7:56–60. In fact, Petitioner admits that in Ishiyama the request message's outer packet's source address is unencrypted. *See, e.g.*, Tr. 27:9–16. However, the outer packet's source address is a part of the request message in Ishiyama. *See, e.g.*, Ex. 1004, Fig. 4, 8:59–65. For example, Ishiyama teaches:

> [W]hen the current location address of the mobile computer is changed to a new address, the mobile computer notifies the change of the own current location address to the correspondent by setting the new current location address as the source address of the outer packet of the encapsulated packet. Upon receiving this encapsulated packet, the correspondent can continue communications by changing only the destination address of the outer packet to the new current location address in the encapsulated packets to be transmitted thereafter.

*Id.* at 6:13–22. Thus, Ishiyama describes the request message as including the outer packet, and that packet is unencrypted.

Claim 1 recites "the request message . . . being encrypted." Ex. 1001, 11:6. Thus, the plain words of the claim state that the message is encrypted—not that a portion of the message is encrypted. The '810 patent Specification likewise does not describe that only a portion of the request message is encrypted. *Id.* at 9:63–10:8. Specifically, the Specification discloses that, "[i]n signal 10a of [Figure 5]," which is sent from the mobile terminal when a mobile terminal moves to address B, "a request for registration (RREQ) of the new address is sent." *Id.* at 9:66–10:2. The Specification adds that "signal[] 10a . . . can be encrypted and/or authenticated." *Id.* at 10:4–5. Petitioner does not identify any description in

20

IPR2019-00819
Patent 7,620,810 B2

the '810 patent of encrypting only a portion of the request message. *See* Pet. Reply 18–19; Tr. 67:8–68:20. At the hearing, Petitioner argued that one of ordinary skill in the art would have understood that only a portion of the message need be encrypted. Tr. 67:8–68:20. Petitioner, however, fails to provide any persuasive evidence in support of this reading of the claim in view of the express claim language and the description in the Specification.

Petitioner's papers provide no basis to allow for a portion of the request message to be unencrypted. *See generally* Pet. 45–47; Pet. Reply. 18–19. Simply put, claim 1 requires that the request message (not just a portion thereof) is encrypted, and Petitioner fails to show that Ishiyama's request message (which includes the unencrypted outer packet's source address) meets this requirement. Ex. 1001, 11:6; *see also In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998) ("[T]he name of the game is the claim.").

Furthermore, during the oral hearing, Petitioner repeated its argument that Ishiyama's request message is encrypted because the encapsulated packet is encrypted, even though the outer packet's header is unencrypted. *See* Tr. 27:9–11, 30:3–11. Having an unencrypted outer packet "would be just like [what] the claims would require, as well, because you can't send a request message without having an outer packet that's unencrypted," according to Petitioner. *Id.* at 30:12–16. Put differently, Petitioner argued:

> [T]he request message that's being sent is encrypted. The outer header isn't encrypted, but the rest of the message is. And there's a reason why the outer header isn't encrypted: because it can't be. If the outer header was encrypted, then the message wouldn't be able to be sent because nobody would be able to know what the destination and source addresses are. So, of course, the outer header isn't encrypted, but the rest of the message is, in fact, encrypted.

IPR2019-00819
Patent 7,620,810 B2

*Id.* at 27:9–16.  We are not persuaded by Petitioner's argument that Ishiyama teaches this limitation because the outer header cannot be encrypted.  First, Petitioner does not point to any evidence to support this argument, and thus, we do not credit it.  *See In re Geisler*, 116 F.3d 1465, 1470 (Fed. Cir. 1997) (explaining that attorney arguments and conclusory statements that are unsupported by factual evidence are entitled to little probative value).

Second, even if we consider this argument, Petitioner conflates a request message that includes its unencrypted outer packet as a part of the request message (such as in Ishiyama) with a request message that does not (e.g., a request message that is contained wholly within the encrypted encapsulated packet), and Petitioner does not account for the latter.  *E.g.*, Tr. 27:9–16, 30:12–16.  Nor does Petitioner provide any argument or evidence to show that an example request message (i.e., "a registration request (RREQ)") disclosed in the '810 patent is not wholly within the encrypted encapsulated packet.  *See generally* Pet.; Pet. Reply; *see also* Ex. 1001, 7:43–62.

Lastly, we find Patent Owner's arguments concerning Ishiyama's SA Gateway Update not specifying a format (including as to whether there is encryption) for its operation 5 of Figure 7 inapposite.  PO Resp. 61–63. Patent Owner ignores that the Petition also relies of Ishiyama's Figure 4, and its accompanying text, which teach that Ishiyama's request message comprises an outer packet having its source address changed to the second (moved to) address and an encapsulated inner packet.  Pet. 35–36 (citing Ex. 1004, 8:59–65; annotating Ex. 1004, Fig. 4).  We likewise do not credit the testimony of Patent Owner's expert, Dr. Rouskas, on this point as he also

ignores Ishiyama's Figure 4, and its accompanying text. *See* Ex. 2003 ¶ 157.

In summary, we find that Petitioner fails to show that Ishiyama teaches a limitation of claim 1, for which Petitioner relies on Ishiyama solely. Thus, Petitioner has not demonstrated by a preponderance of the evidence that claim 1 of the '810 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama and Murakawa.

### D. Challenged Claims 4 and 5

Claims 4 and 5 depend from independent claim 1, and thus, incorporate claim 1's limitations. We determine above that the combination of Ishiyama and Murakawa fails to teach a limitation of independent claim 1. In addition, the Petition does not present any information with respect to dependent claims 4 or 5 that addresses the deficiencies discussed above regarding independent claim 1. Pet. 54–59. Thus, Petitioner has not demonstrated by a preponderance of the evidence that claims 4 and 5 of the '810 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama and Murakawa.

### E. Challenged Claim 7

Claim 7 is an independent claim. Petitioner combines Ishiyama and Murakawa in two alternative ways in arguing that claim 7[9] would have been obvious to one of ordinary skill in the art. *See* Pet. 12–54; Dec. on Inst. 24–25, 37–38 (noting the two alternative ways). Below we address Petitioner's

---

[9] Petitioner argues that "[t]he limitations of independent claim 7 are substantially similar to claim 1." Pet. 47–48. Thus, for claim 7, Petitioner adopts its arguments from claim 1 for the shared limitations. *Id.* Likewise, "Patent Owner relies on the same responses it provided . . . for claim 1 regarding these limitations of claim 7." PO Resp. 64–65.

IPR2019-00819
Patent 7,620,810 B2

second way of combining Ishiyama and Murakawa (i.e., combining Ishiyama's address changing functionality with Murakawa's security gateway and another terminal)). In other words, Petitioner combines Ishiyama's "address updating for a mobile terminal operating in the IPsec tunneling mode" with "Murakawa's . . . security gateway configuration" for "tunneling of communications through a security gateway so that two terminals are able to communicate." *E.g.*, Pet. 23–24 (citing Ex. 1004, 7:46–49; Ex. 1005, 4:13–16; Ex. 1002 ¶ 61). For that combination, we find that Petitioner demonstrates by a preponderance of the evidence that claim 7 would have been obvious to one of ordinary skill in the art. Because of this finding, we do not reach the parties' arguments concerning the first way Petitioner combines Ishiyama and Murakawa. For example, we do not reach whether Ishiyama teaches that its correspondent host is a security gateway.

### 1. Preamble

Claim 7's preamble recites "[a] method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween." Ex. 1001, 12:1–4. We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches claim 7's preamble. Pet. 24–29, 47. As we find that Ishiyama and Murakawa teach the preamble, we need not determine whether the preamble is limiting.

As to Ishiyama, we agree with Petitioner that Ishiyama teaches "a mobile communication scheme capable of easily changing a connected location of a mobile computer on [an] IP network." Ex. 1004, 2:42–45; Pet. 25. More specifically, we find that Ishiyama teaches using care-of addresses ("CoA") for a "mobile computer 2 [that] always uses the IPSEC in

the tunnel mode at a time of making a connection to the correspondent host 3." Ex. 1004, 7:66–67, 11:9–16; Pet. 25.

As to Murakawa, we agree with Petitioner and find that Murakawa teaches forwarding messages received from a terminal at a security gateway located between the terminal and another terminal. *E.g.*, Ex. 1005, Fig. 5; Pet. 27–28 (annotating Ex. 1005, Fig. 5). As illustrated in Figure 5, Murakawa discloses that PC 101 establishes an IPSec tunnel (VPN 108), with security gateway 103. Ex. 1005, 1:61–63, 2:62–65, Fig. 5; Pet. 28. Murakawa's security gateway 103 connects to PC 106 and PC 107. Ex. 1005, 1:59–60. We agree with Petitioner and find that either PC 106 or PC 107 is the claimed another terminal. *Id.* at 1:61–2:4, Fig. 5; *see also* Pet. 28 (annotating Ex. 1005, Fig. 5 (labeling PC 106 and PC 107 "Other Terminals")). We find that Murakawa's network system allows for PC 101 and another terminal (e.g., PC 106 or PC 107) to communicate securely via security gateway 103. Ex. 1005, 1:64–2:4, Fig. 5; Pet. 28.

Lastly, we are not persuaded by Patent Owner's arguments that "[i]ncorporating Murakawa's security gateway 103 into Ishiyama does not fill in the missing limitation of . . . '[an]other terminal' because no host computer has been incorporated from Murakawa." PO Resp. 49; *see also id.* at 45 (explaining that the claim recites "another terminal" and "other terminal"). Put differently, Patent Owner argues that "Petitioner's modification of Ishiyama by Murakawa does not explain how the combination provides the recited 'other terminal.'" *Id.* (citing Ex. 2003 ¶¶ 143–144). To the contrary, Petitioner argues that "Murakawa describes the forwarding of messages at a security gateway located between a mobile terminal and other terminals." Pet. 27. Petitioner then proceeds to

IPR2019-00819
Patent 7,620,810 B2

describe Murakawa's Figure 5, and to identify Murakawa's PC 106 and PC 107 as other terminals. *See id.* at 27–28 (citing Ex. 1005, 1:59–63; annotating Ex. 1005, Fig. 5 (labeling PC 106 and PC 107 "Other Terminals")). Petitioner again identifies Murakawa's PC 106 as the other terminal when arguing that the other terminal sends a secure message to the second address of the mobile terminal via the security gateway. Pet. 52 (annotating Ex. 1005, Fig. 8 (labeling PC 106 "Other Terminal"). Thus, we disagree with Patent Owner that "no host computer has been incorporated from Murakawa." PO Resp. 49.

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "[a] method for ensuring secure forwarding of a message in a telecommunication network, having at least one mobile terminal and another terminal and a security gateway therebetween."

## 2. *Establishing a Secure Connection*

Claim 7 further recites "establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway." Ex. 1001, 12:5–9. We agree with Petitioner that the combination of Ishiyama and Murakawa teaches this limitation. Pet. 29–33, 47. We find that Ishiyama teaches that mobile computer 2 first establishes an IPSec tunnel between its first address (CoA1) and correspondent host 3's address (CN). Ex. 1004, 8:25–26, 8:36–38, 8:43–47, 8:50–53, 11:9–17, 12:3–5, Fig. 4; Pet. 30–31, 45. Furthermore, Ishiyama teaches that the IPSec tunnel is defined by, *inter alia*, the addresses

IPR2019-00819
Patent 7,620,810 B2

of mobile computer 2 and correspondent host 3.  Ex. 1004, 12:9–12, 12:51–59; Figs. 9A, 9B; Pet. 32–33.

In addition, we agree with Petitioner and find that Murakawa teaches a security gateway.  Ex. 1005, 1:59–2:4, 2:62–65, 4:13–16, Fig. 5; Pet. 23–24, 27–29, 28 (citing Ex. 1005, Fig. 5) (annotating the figure with "Security Gateway").  Moreover, Murakawa teaches establishing a secure connection between a terminal (PC 101) and the security gateway.  Ex. 1005, 1:61–63 ("[I]n order to perform the IPsec communication, VPN 108 is established between PC 101 and security gateway 103."), Fig. 5.

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and an other terminal teaches "establishing a secure connection between a first address of the mobile terminal and an address of the security gateway, the secure connection defined by at least the addresses of the mobile terminal and the security gateway."

### 3.  Mobile Terminal Moving Addresses

Claim 7 further recites "the mobile terminal moving from the first address to a second address."  Ex. 1001, 12:10–11.  We agree with Petitioner and find that Ishiyama teaches that after the IPSec tunnel has been established, Ishiyama's mobile computer 2 moves networks, moving from a first address (CoA1) to a second address (CoA2).  *See, e.g.*, Ex. 1004, 8:55–57, Fig. 4; Pet. 34, 48.  This is depicted in Ishiyama's Figure 4, as annotated by Petitioner, where mobile terminal 2 moves from its first location (dashed red box corresponding to CoA1) to its second location (solid red box corresponding to CoA2).  *See* Pet. 34 (annotating Ex. 1004, Fig. 4).

27

IPR2019-00819
Patent 7,620,810 B2

Based on Ishiyama's teachings, we find that the combination of Ishiyama and Murakawa teaches "the mobile terminal moving from the first address to a second address."

### 4.  While at the Second Address

Claim 7 further recites "while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway." Ex. 1001, 12:12–16.  We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches this limitation.  Pet. 35–37, 48.  We find Ishiyama teaches that after changing addresses, mobile computer 2 sends a request message (having CoA2 for its outer packet's source address) to correspondent host 3 via the IPSec tunnel, requesting that correspondent host 3 update to mobile computer 2's new address.  Ex. 1004, 8:59–65, 11:39–45, 12:66–13:5, Figs. 4, 7; Pet. 35–37.  We provide a more detailed analysis of Ishiyama's request message above in our discussion of claim 1.[10]  *See supra* Section VI(C) (addressing, *inter alia*, Ishiyama's Figures 4 and 7, and accompanying text).  Our findings above regarding Ishiyama's request message also apply here.  *Id.*  In addition, as we discuss in detail above, Murakawa teaches a security gateway, as well as establishing a secure connection between a terminal (PC 101) and the security gateway.  *See, e.g.*, Ex. 1005, 1:59–2:4, 2:62–65, 4:13–16, Fig. 5; *supra* Section VI(E)(1)–(2)

---

[10] Although claim 1 and claim 7 both recite this limitation, claim 7 does not have an additional limitation requiring that the request message is encrypted. *Compare* Ex. 1001, 10:48–11:8, *with* Ex. 1001, 12:1–22.

IPR2019-00819
Patent 7,620,810 B2

(discussing our findings regarding, *inter alia*, Figure 5's and Figure 8's teachings).

We find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "while at the second address, the mobile terminal sending a request message to the address of the security gateway to request the security gateway to change the secure connection to be defined between the second address and the address of the security gateway."

### 5. *Security Gateway Changing an Address Definition*

Claim 7 further recites "the security gateway changing an address definition of the secure connection from the first address to the second address." Ex. 1001, 12:17–19. We agree with Petitioner and find that the combination of Ishiyama and Murakawa teaches this limitation. Pet. 37–39, 48. We find that Ishiyama teaches that correspondent host 3 detects mobile computer 2's address change based on the request message (i.e., the source address in the request message's outer packet has changed), and updates mobile computer 2's address to CoA2 for the IPSec tunnel in the correspondent host's SA database. *See* Ex. 1004, 8:66–9:4, 12:51–59, Figs. 9B, 9D (illustrating exemplary SA databases); Pet. 38. Ishiyama's Figure 9B (mobile computer's first location) and Figure 9D  (mobile computer's second location) illustrate this update at the correspondent host (labeled "CN" in the figures) by replacing Figure 9B's "dst" field value of "CoA1" with "CoA2," as shown in Figure 9D. *Compare* Ex. 1004, Fig. 9B, *with id.* at Fig. 9D.  "As a result of these operations, at the correspondent [node] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all

29

IPR2019-00819
Patent 7,620,810 B2

the security associations is changed to the current CoA 'CoA2'."  Ex. 1004,

12:66–13:3; Pet. 39.  In addition, as we discuss in detail above, Murakawa

teaches a security gateway, as well as establishing a secure connection

between a terminal and the security gateway. *See, e.g.*, Ex. 1005, 1:59–2:4,

2:62–65, 4:13–16, Fig. 5; *supra* Section VI(E)(1)–(2) (discussing our

findings regarding, *inter alia*, Figure 5's and Figure 8's teachings).

In summary, we find combining Ishiyama's mobile address changing

functionality with Murakawa's security gateway and another terminal

teaches "the security gateway changing an address definition of the secure

connection from the first address to the second address."

### 6. *Other Terminal Sending a Secure Message*

Claim 7 further recites "the other terminal sending a secure message

in the secure connection to the second address of the mobile terminal via the

security gateway." Ex. 1001, 12:20–22.  We agree with Petitioner and find

that the combination of Ishiyama and Murakawa teaches this limitation.

Pet. 48–54.  We find that Ishiyama teaches sending a secure message from

Ishiyama's correspondent host to the mobile computer's second location, as

shown below in Figure 7's operation (7), as annotated by Petitioner. *See*

Pet. 49 (annotating Ex. 1004, Fig. 7).

IPR2019-00819
Patent 7,620,810 B2



Annotated Figure 7 "is a sequence chart showing an exemplary processing sequence in the case where the mobile computer initiates communications at a visited site and then changes . . . location" with a green box around the correspondent node ("CN") identifier and a red box around the mobile computer identifier ("MN").  Ex. 1004, 5:20–23; Pet. 49 (annotating Ex. 1004, Fig. 7).  Ishiyama teaches that as a result of its CoA update operations, "at the correspondent [host] currently communicating with the mobile computer 2, the endpoint of the IPSEC tunnel is changed from 'CoA1' to 'CoA2' as the destination of all the security associations,'" and "[c]onsequently, the session is guaranteed even when the mobile computer 2 moves . . . ."  Ex. 1004, 12:66–13:5; Pet. 49.  Put differently, as Figure 7 illustrates, the secure message is sent to the second address of the mobile terminal from Ishiyama's correspondent host.  Ex. 1004, Fig. 7

31

IPR2019-00819
Patent 7,620,810 B2

(illustrating for operation (7) that the outer packet's Src: has the value "CN" and Dst: has the value "CoA2").

As to Murakawa, we agree with Petitioner and find that Murakawa teaches an other terminal sending a secure message in a secure connection to an address of a terminal via the security gateway. *E.g.*, Ex. 1005, Fig. 5; Pet. 51–53. This is shown in Murakawa's Figure 5, shown below as annotated in the Petition. *See* Pet. 51 (providing annotated Figure 5).



Murakawa's Figure 5, as annotated by Petitioner, shows a "prior art typical network system" with (i) a red box around PC 101 and labeled "Mobile Terminal," (ii) a green box around security gateway 103 and labeled "Security Gateway," and (iii) a blue box around each of PC 106 and PC 107, and labeled "Other Terminals." Ex. 1005, 4:32–33; Pet. 51 (annotating Ex. 1005, Fig. 5). As illustrated in Figure 5, Murakawa teaches

32

IPR2019-00819
Patent 7,620,810 B2

that an other terminal (PC 106) sends a secure message in the secure connection (VPN 108) to the mobile terminal (PC 101) via security gateway 103.  *Id.* at 1:61–2:4, 2:62–65, Fig. 5; *see also supra* Section VI(E)(1) (discussing our findings regarding Figure 5's teachings).  Furthermore, Figure 8, shown below as annotated in the Petition, also illustrates the addressing of the secure message sent from PC 106 (other terminal) to the PC 101 (mobile terminal).

FIG. 8   PRIOR ART



Annotated Figure 8 "illustrates diagrammatically . . . prior art IPsec communication in the tunnel mode" with (i) a red box around PC 101 and labeled "Mobile Terminal," (ii) a green box around security gateway 103 and labeled "Security Gateway," and (iii) a blue box around PC 106, and labeled "Other Terminal."  Ex. 1005, 4:41–42; Pet. 52 (annotating Ex. 1005, Fig. 8).  As illustrated, "IP addresses 'A', 'B', and 'C' are assigned to PC 101, security gateway 103, and client PC 106, respectively."  Ex. 1006, Fig. 5, 3:4–6; Pet. 52. Murakawa teaches the following:

33

IPR2019-00819
Patent 7,620,810 B2

> When client PC 106 on LAN 104 transmits an IP packet to PC 101, which has established connection with PC 106 via VPN 108,
>
>> 1) client PC 106 generates IP packet 100 in which the sender's IP address is "C" and the receiver's IP address is "A", then sends it to security gateway 103;
>>
>> 2) received packet 100, gateway 103 identifies that the packet is the one to be sent to PC 101 which has established VPN 108;
>>
>> 3) gateway 103 encapsulates IP packet 100 according to exchanged information during the IKE communication;
>>
>> 4) the IP header including the sender's IP address B and the receiver's IP address "A" is added to outside the originally set IP address;
>>
>> 5) authentication information is added to the encapsulated IP packet based on the exchanged information, then the IP packet is encrypted;
>>
>> 6) received the encapsulated packet via VPN 108, PC 101 retrieves encapsulated original IP packet 100 from the received packet, according to the exchanged information, then process[es] it.

Ex. 1005, 3:8–28; Pet. 52–53.  In other words, Murakawa teaches an other terminal sending a secure message in a secure connection to an address of a mobile terminal via the security gateway. *Id.*  Furthermore, we credit Dr. Goldschlag's testimony that one of ordinary skill in the art would have understood that Murakawa teaches a well-known IPSec tunnel mode configuration with a security gateway facilitating communication between a mobile terminal and other terminals because this testimony is consistent with our findings of Murakawa's teachings. *See* Ex. 1002 ¶¶ 66–67.

Accordingly, we find that the combination of Ishiyama and Murakawa teaches the other terminal (PC 106) sending a secure message in the secure connection (VPN 108) to the second address (CoA2) of the mobile terminal via security gateway 103.

Lastly, we are not persuaded by Patent Owner's arguments that Ishiyama's "operation (7) is an end-to-end, two-component secure communication from correspondent terminal CN to mobile terminal MN," and does not teach "[t]he three-component communication called for by the claim (other terminal-security gateway-first terminal)." PO Resp. 66–67 (citing Ex. 2003 ¶¶ 161–162). Patent Owner focuses on Ishiyama's teachings individually, rather than the combined teachings of Ishiyama and Murakawa. *See In re Merck & Co.*, 800 F.2d 1091, 1097 (Fed. Cir. 1986) ("Non-obviousness cannot be established by attacking references individually where the rejection is based upon the teachings of a combination of references"). Again, as to the second way Petitioner combines Ishiyama and Murakawa, Ishiyama's mobile address changing functionality is combined with Murakawa's security gateway configuration (e.g., security gateway 103 and other terminal 106). *See* Pet. 12–54; Dec. on Inst. 24–25, 37–38 (noting the two alternative ways). Hence, a mobile terminal securely communicates with another terminal via Murakawa's security gateway 103 rather than Ishiyama's correspondent host 3. *Id.*

In summary, we find combining Ishiyama's mobile address changing functionality with Murakawa's security gateway and another terminal teaches "the other terminal sending a secure message in the secure connection to the second address of the mobile terminal via the security gateway."

### 7. *Combining Ishiyama and Murakawa*

For the reasons we provide below, we find that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have found it obvious to combine Ishiyama's mobile

IPR2019-00819
Patent 7,620,810 B2

address changing functionality with Murakawa's security gateway and other terminal in the manner claimed.

First, we agree with Petitioner and find that Ishiyama teaches using IPSec in tunnel mode with its mobile address changing functionality. *E.g.*, Ex. 1004, 8:43–65, 11:9–16, Fig. 4; Pet. 21–22, 24. More specifically, we find that Ishiyama teaches that "mobile computer 2 always uses the IPSEC in the tunnel mode at a time of making a connection to the correspondent host 3." Ex. 1004, 11:9–16. Figure 4 also illustrates that mobile computer 2 connects to correspondent host 3 via an IPSec tunnel. *See* Ex. 1004, Fig. 4 (labeling the connections as "IPSEC TUNNEL"), 8:43–65; Pet. 25.

Second, Petitioner persuasively shows that one of ordinary skill in the art would have understood that tunnel mode was used for communicating via a security gateway. Specifically, we find that one of ordinary skill in the art would have known that "[t]unnel mode . . . is generally used for sending

IPR2019-00819
Patent 7,620,810 B2

messages through more than two components . . . ." Ex. 1001, 3:16–19[11];

Pet. 21 (citing Ex. 1001, 3:16–27, Ex. 1002 ¶ 57).  We also credit in support

of this finding the below deposition testimony of Patent Owner's expert, Dr.

Rouskas, who testified as follows:

> Q:  So in all the instances where you personally have used IPSec,
> you have only ever used IPSec tunnel mode with security
> gateway being one of the endpoints.  Right?
>
> A:  So I have been using IPSec for, you know, more than 20
> years.  But to the best of my recollection that is right, I have only
> used it when one of endpoints is security gateway.

Ex. 1019, 111:21–112:9; Pet. Reply 8.  In addition, we credit Dr.

Goldschlag's declaration testimony, which is consistent with

contemporaneous evidence in the record, that "[t]unnel mode is used when

---

[11] "Statements in a challenged patent's specification may be used . . . when
they evidence the general knowledge possessed by someone of ordinary skill
in the art."  Memorandum:  Treatment of Statements of the Applicant in the
Challenged Patent in Inter Partes Reviews Under § 311 (Aug. 2020)
(available at
https://www.uspto.gov/sites/default/files/documents/signed_aapa_guidance_
memo.pdf), 4.  "Permissible uses . . . under § 103 include . . . supporting a
motivation to combine particular disclosures."  *Id.* at 6 (citing *Koninklijke
Philips v. Google*, 948 F.3d 1330, 1337–38 (Fed. Cir. 2020)).  We find that
the statements cited by Petitioner from the '810 patent's Technical
Background section evidence the general knowledge possessed by one of
ordinary skill in the art at the time of the invention of the '810 patent as they
are contained in the "Technical Background" section and are consistent with
the evidence of record.  *See, e.g.*, Pet. 8 (citing, e.g., Ex. 1001, 3:8–9, 3:12–
13, 3:19–21), 11 (citing Ex. 1001, 3:19–21), 20 (citing same), 21 (citing
Ex. 1001, 3:19–27).  Patent Owner does not challenge Petitioner's reliance
on statements from the Technical Background section of the '810 patent.
*See generally* PO Resp.  Even so, we reach the same conclusions even
without reliance on the statements from the '810 patent.

IPR2019-00819
Patent 7,620,810 B2

one or both ends of an SA is a security gateway . . . that implements IPSec."
Ex. 1002 ¶ 33 (quoting Ex. 1009, 14) (emphasis omitted); *see also* Ex. 1001,
3:19–21 (admitting that "tunnel mode is often used when one or both ends of
a SA is a security gateway, such as a firewall or a router that implements
IPSec"); Pet. 50.

Lastly, we agree with Petitioner and find that tunneling packets
through a security gateway for two terminals to communicate (such as in
Murakawa) was well-known in the art at the time of the invention of the
'810 patent.  Pet. 27–29.  In particular, we find that Murakawa's security
gateway configuration (e.g., Figure 5) is "a prior art typical network
system," which provides communications between terminals.  Ex. 1005,
4:32–33, Fig. 5; Pet. 27–28.  Moreover, in its Technical Background section,
the '810 patent teaches the following:

> The IPSec tunnel mode operates e.g. in such a way that if
> a host on a network generates an IP packet with a destination
> address of another host on another network, the packet is routed
> from the originating host to a security gateway (SGW), firewall
> or other secure router at the boundary of the first network.  The
> SGW or the like filters all outgoing packets to determine the need
> for IPSec processing.  If this packet from the first host to another
> host requires IPSec, the firewall performs IPSec processing and
> encapsulates the packet in an outer IP header.  The source IP
> address of this outer IP header is this firewall and the destination
> address may be a firewall that forms the boundary to the other
> local network.  This packet is now routed to the other host[']s
> firewall with intermediate routers examining only the outer IP
> header.  At the other host firewall, the outer IP header is stripped
> off and the inner packet is delivered to the other host.

Ex. 1001, 3:44–59; *see also* Pet. 50 (citing same).  In other words, this
passage also teaches that tunneling packets through a security gateway for
two terminals to communicate was well-known in the art at the time of the

IPR2019-00819
Patent 7,620,810 B2

invention of the '810 patent.  Ex. 1001, 3:44–59.  We also credit Dr. Goldschlag's testimony that it was well-known in the art for a security gateway, such as that disclosed in Murakawa, to facilitate communication between a mobile terminal and other terminals as this testimony is consistent with Murakawa's teachings.  Ex. 1002 ¶ 66; Pet. 53.

In summary, we find that (1) Ishiyama's address changing functionality employs tunnel mode, (2) tunnel mode was generally used when at least one end of an SA was a security gateway, and (3) Murakawa teaches a typical, prior art security gateway configuration.  Based on these findings, we find that one of ordinary skill in the art would have found it obvious to employ Ishiyama's address changing functionality with a security gateway, such as taught in Murakawa.  *See PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1365 (Fed. Cir. 2018) ("[T]he motivation to modify a reference can come from the knowledge of those skilled in the art, from the prior art reference itself, or from the nature of the problem to be solved.") (citation omitted).

Put differently, based on these findings, Ishiyama's use of tunnel mode would have suggested to one of ordinary skill in the art using Ishiyama's address changing functionality with Murakawa's security gateway configuration.  *Id.*; Pet. 23–24, 27 (citing Ex. 1002 ¶¶ 33–36), 28–29, 53.  We also credit Dr. Goldschlag's testimony that one of ordinary skill in the art "reading Ishiyama would have understood that the use of tunnel mode suggests the use of a security gateway that tunnels messages to an 'other node.'"  Ex. 1002 ¶ 61 (citing *id.* ¶¶ 33–36); Pet. 24.  This testimony is consistent with our findings discussed above.

IPR2019-00819
Patent 7,620,810 B2

Additionally, we also credit the following testimony of Dr. Goldschlag:

> [I]n view of Ishiyama's stated goal of addressing a mobile terminal with a changing address, [one of ordinary skill in the art] would have understood that implementing Ishiyama's correspondent host functionality with the security gateway described in Murakawa would be highly desirable in the telecommunication context. As Ishiyama explains, implementing its IPsec address updating algorithm allows a mobile terminal and a security gateway to maintain communication 'without interrupting the session' initially established even when the mobile terminal changes to another address.

Ex. 1002 ¶ 67 (citing Ex. 1004, 6:54–60); *see also* Pet. 29 (citing Ex. 1002 ¶ 67).  We find that one of ordinary skill in the art would have been motivated to incorporate Ishiyama's mobile address changing functionality with Murakawa's security gateway configuration "to maintain communication 'without interrupting the session' initially established even when the mobile terminal changes to another address."  Ex. 1002 ¶ 67; *KSR*, 550 U.S. 417 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious . . . .").  Moreover, we do not find this testimony conclusory, as Patent Owner alleges (PO Resp. 50), because Dr. Goldschlag explains why combining Ishiyama and Murakawa would have been highly desirable (i.e., because it would maintain communication without interrupting the session).  Ex. 1002 ¶ 67 (citing Ex. 1004, 6:54–60).  We agree that having no interruption when the mobile terminal moves "would [have] be[en] highly desirable in the telecommunication context."  *Id.*

IPR2019-00819
Patent 7,620,810 B2

We are not persuaded by Patent Owner's arguments that Petitioner "fails to provide the requisite explanation as to **how** Ishiyama and Murakawa are to be combined or **what is the operation of the resulting combination**."  PO Resp. 51–52; *see also id.* at 59 (citing Ex. 2003 ¶ 152), 67 (citing Ex. 2003 ¶ 165) (making same arguments).  Rather, we agree with Petitioner and find that one of ordinary skill in the art "could[12] have easily performed th[e] implementation" of combining Ishiyama's address changing functionality with the security gateway described in Murakawa "in view of the security gateway suggestion from Ishiyama's tunnel mode operation."  Pet. 29 (citing Ex. 1002 ¶ 67).  Simply put, Ishiyama's mobile computer 2 communicates with correspondent host 3 using IPSec tunnel mode just as Murakawa's PC 101 communicates with security gateway 103 using IPSec tunnel mode.  *E.g.*, Ex. 1004, 8:43–49, 11:9–16, Fig. 4; Ex. 1005, 1:61–63, 2:62–65, Fig. 5; Pet. 53.  Ishiyama's address changing functionality utilizes the outer packet's source address with Ishiyama's tunnel mode connection.  *E.g.*, 1004, 8:43–65, Fig. 4.  Petitioner's combination likewise utilizes the outer packet's source address (as in Ishiyama) with Murakawa's tunnel mode connection.  *E.g.*, 1004, 8:43–65, Fig. 4.; Ex. 1005, 1:59–2:4, Fig. 5; Pet. 43–44; Pet. Reply 16–17 (citing Pet. 43–44; Ex. 1020 ¶¶ 48–56).

---

[12] Although we consider whether one of ordinary skill in the art "could" have combined Ishiyama's and Murakawa's relevant teachings with respect to these arguments related to operability, we above find that one of ordinary skill in the art "would" have combined Ishiyama's and Murakawa's relevant teachings.  *See PGS Geophysical*, 891 F.3d at 1365 (recognizing that whether one of ordinary skill in the art "could" or "would" have combined references are related, separate questions); *see also supra* Section VI(E)(7) (finding that one of ordinary skill in the art would have combined the references).

IPR2019-00819
Patent 7,620,810 B2

Moreover, we do not find Dr. Goldschlag's testimony conclusory, as Patent
Owner alleges (PO Resp. 68), but rather Dr. Goldschlag explains that one of
ordinary skill in the art could have easily combined Ishiyama's address
changing functionality with the security gateway described in Murakawa in
light of Ishiyama's tunnel mode operation (i.e., both Murakawa and
Ishiyama employ tunnel mode). *See* Ex. 1002 ¶ 67.

We also are not persuaded by Patent Owner's argument that "the
security gateway 103 and computer 106 illustrated in Murakawa's Figure 5
could not be combined into the address changing system as of Ishiyama
illustrated in Figure 4." PO Resp. 53. In particular, Patent Owner argues
"that Ishiyama's security policy databases [("SPDs")] (Figures 8A–8B) and
the security association databases [("SADs")] (Figures 9A–9D) would not
operate if the components of Murakawa were inserted in place of Ishiyama's
correspondent host." *Id.* (citing Ex. 2003 ¶ 148). Contrary to Patent
Owner's arguments, however, "it is not necessary that the inventions of the
references be physically combinable to render obvious the invention under
review." *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983). The relevant
inquiry is whether the claimed subject matter would have been obvious to
those of ordinary skill in the art in light of the combined teachings of those
references. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981). And, as we
find above, one of ordinary skill in the art would have found it obvious to
combine Ishiyama's address changing functionality with Murakawa's
security gateway and other terminal. This does not mean that Ishiyama's
specific SPD and SAD databases are used in that combination, as Patent
Owner argues. *In re Nievelt*, 482 F.2d 965, 968 (CCPA 1973) ("Combining
the *teachings* of references does not involve an ability to combine their

IPR2019-00819
Patent 7,620,810 B2

specific structures."); *see also In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) ("It is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." (citing *In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (en banc))). Rather, one of ordinary skill in the art would have "be[en] able to fit the teachings of [Ishiyama and Murakawa] . . . together like pieces of a puzzle" because the skilled artisan is "a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 420–21. Likewise, we are not persuaded by Patent Owner's example that if a new terminal with a new address was added, "the Ishiyama system would be unable to process messages sent to or received from the new terminal" because the new address would not be found in Ishiyama's SPD. PO Resp. 53–54. Again, combining the teachings of Ishiyama and Murakawa does not involve woodenly combining their specific structures, and does not require using Ishiyama's specific SPD. *Nievelt*, 482 F.2d at 968. And, Murakawa's existing role in addressing packets between terminals (e.g., PC 101 and PC 106) also remains a part of Petitioner's combination. *See, e.g.*, *supra* Section VI(E)(6) (discussing Murakawa's Figure 8, and accompanying text, concerning addressing messages sent between terminals via a security gateway); Pet. 52–53.

Likewise, we are not persuaded by Patent Owner's argument that "Petitioner fails to explain what modifications to Ishiyama's . . . [SPDs and SADs] would be required for Ishiyama to work with security gateway 103 as the opposing endpoint instead of correspondent host 3." PO Sur-Reply 20 (citing Ex. 1004, Figs. 8–9). Again, Ishiyama's specific SPDs and SADs are not part of Petitioner's combination. *In re Nievelt*, 482 F.2d at 968. In

IPR2019-00819
Patent 7,620,810 B2

addition, we agree with Petitioner and find that SADs and SPDs are commonplace in IPSec communications, and security gateways are required to have at least "one pair of SADs and one pair of SPDs." *See* Pet. Reply 13 (citing Ex. 1011, 13; Ex. 1019, 89:8–15); *see also* Ex. 1020 ¶ 56. And, we agree with Petitioner that Ishiyama's description of SPDs and SADs "does not preclude the operation of a security gateway also implementing these components." Pet. Reply 17 (citing Ex. 1020 ¶ 56). In other words, we find that one of ordinary skill in the art would have understood that the address changing functionality used with Ishiyama's SPDs and SADs also can be used with the SPDs and SADs of a common security gateway configuration, such as described by Murakawa. *See* Ex. 1011, 13; Ex. 1019, 89:8–15; Ex. 1020 ¶ 56. Accordingly, we find that one of ordinary skill in the art would have found it obvious to combine the teachings of Ishiyama and Murakawa to provide for Ishiyama's address changing functionality being incorporated into Murakawa's security gateway configuration. *See KSR*, 550 U.S. at 420–21 (finding the skilled artisan would "be able to fit the teachings of multiple patents together like pieces of a puzzle" because the skilled artisan is "a person of ordinary creativity, not an automaton"). In addition, we find misplaced Patent Owner's focus on Petitioner's use of the word "preclude." PO Sur-Reply 18 (arguing that Ishiyama "should be interpreted for what it affirmatively teaches as opposed to what it does not 'preclude'") (citation omitted). In the context of Petitioner's argument, it is clear that Petitioner means that Murakawa's security gateway's SPDs and SADs also can implement Ishiyama's address changing functionality. *See* Pet. Reply 17 (citing Ex. 1020 ¶ 56).

IPR2019-00819
Patent 7,620,810 B2

We also are not persuaded by Patent Owner's argument that "[a] person of ordinary skill in the art would not readily understand how Ishiyama's SA databases could be modified to accommodate Murakawa's components." PO Resp. 54 (citing Ex. 2003 ¶ 148). Nor are we persuaded that "[a] person of ordinary skill would not have a reasonable expectation of success given that there is no explanation as to how the references would be combined and how the resulting system would operate," as Patent Owner argues. *Id.* (citation omitted). Rather, as we find above, combining the teachings of Ishiyama and Murakawa does not require using Ishiyama's specific SA databases. *Nievelt*, 482 F.2d at 968. And, as we find above, one of ordinary skill in the art would and could have easily combined Ishiyama's address changing functionality with the security gateway described in Murakawa. *See* Ex. 1002 ¶ 67.

We also are not persuaded by Patent Owner's argument that "a person of ordinary skill would be taught away from combining Ishiyama and Murakawa." PO Resp. 54. We find that Patent Owner does not cite any portion of Ishiyama that criticizes, discredits, or otherwise discourages combining Ishiyama's mobile address changing functionality with Murakawa's security gateway configuration. *Id.*; *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004) (teaching away requires that a reference "criticize, discredit, or otherwise discourage" investigation into the claimed solution). To the contrary, as we find above, Ishiyama's use of tunnel mode suggests combining its address changing functionality with Murakawa's security gateway configuration. *In re Urbanski*, 809 F.3d 1237, 1243–44 (Fed. Cir. 2016) (finding that there was no teaching away as the prior art references suggested the modification and did not teach that the modified

IPR2019-00819
Patent 7,620,810 B2

process would be inoperable).  We also do not credit Dr. Rouskas' testimony as it is contrary to our findings above.  Ex. 2003 ¶ 148.

Lastly, we agree with Patent Owner that only asserting that references "could" be combined may be insufficient.  PO Resp. 53 (citations omitted). However, as we find above, Petitioner provides persuasive articulated reasoning as to why one of ordinary skill in the art "would" have combined Ishiyama's address changing functionality with Murakawa's security gateway configuration.  Thus, we are not persuaded that Petitioner fails to show sufficient rationale for combining Ishiyama and Murakawa.

Accordingly, for the reasons discussed above, we find that Petitioner provides "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."  *See In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) (citations omitted), *cited with approval in KSR*, 550 U.S. at 418.

### 8.  Alleged Security Flaw

Patent Owner argues in its Sur-Reply[13] that there is "a major security flaw in Ishiyama that would prevent it from ever being used by . . . [one of ordinary skill in the art] as a reference to construct a secure communication system."  PO Sur-Reply 1.  In particular, Patent Owner argues that "the new

---

[13] Petitioner sought our authorization to file a motion to strike Patent Owner's Sur-Reply, or, in the alternative, to file a Sur-Sur-Reply to address the new security flaw argument.  Paper 34, 2.  We denied the request, finding that, as in most cases, we are "capable of identifying new issues . . . when weighing the evidence at the close of trial, and disregarding any new issues . . . that exceeds the proper scope of . . . sur-reply."  *Id.* at 3 (quoting Patent Trial and Appeal Board Consolidated Trial Practice Guide 80 ("Consolidated Practice Guide") (Nov. 2019) (available at https://www.uspto.gov/TrialPracticeGuideConsolidated)).

IPR2019-00819
Patent 7,620,810 B2

source address in the outer packet of Ishiyama's . . . request message . . . is unencrypted and sent in the clear." *Id.* Because of this flaw, one of ordinary skill in the art "would never use Ishiyama's outer packet to change the address definition for the mobile device in a secure connection because it could easily be intercepted by a malicious intermediary and manipulated to cause message traffic to be misdirected to an imposter device," according to Patent Owner. *Id.*; *see also id.* at 2–11 (arguing Ishiyama's security flaw defeats Petitioner's unpatentability allegations).

The security flaw argument, however, is new. Nowhere in its Response does Patent Owner make this argument. *See generally* PO Resp.; *see also* Tr. 48:11–25 (Patent Owner admitting that it did not address the security flaw issue in its Response). Furthermore, Patent Owner admits that "[n]either the Reply nor [Petitioner's] expert's supplemental declaration address the security flaw." PO Sur-Reply 5 n.1 (citing Ex. 1020). Accordingly, we do not consider Patent Owner's security flaw argument because it was not made in the Patent Owner Response and is beyond the proper scope of the Sur-Reply, and thus, is waived. *See* Paper 11 (Scheduling Order), 7 ("Patent Owner is cautioned that any arguments for patentability not raised in the response may be deemed waived."); Consolidated Practice Guide 74 (citing 37 C.F.R. § 42.23) ("Generally, a reply or sur-reply may only respond to arguments raised in the preceding brief.").

IPR2019-00819
Patent 7,620,810 B2

Additionally, we are not persuaded by Patent Owner's arguments to excuse the waiver.[14]  During the oral hearing, Patent Owner argued that the Petition was unclear as to whether the request message was (i) "the message containing the outer header where the source address of the outer header has been changed from CoA1 to CoA2," as shown in Figure 4 of Ishiyama, or (2) "step 5, the SA gateway update operation, of Figure 7 of Ishiyama." Tr. 47:2–14.  Patent Owner argued that it asked Dr. Goldschlag during his deposition "to elaborate on what [Petitioner]'s position was as to what was the claim's request message." *Id.* at 45:2–4.  According to Patent Owner, "Dr. Goldschlag clarified that the claimed request message was step 5 of Figure 7 at the Ishiyama patent," and not the outer header. *Id.* at 45:4–6, 48:19–49:10.  Patent Owner argued that it did not address the security flaw argument in its Response[15] based on (i) the Petition not clearly identifying that the request message includes the outer header, and (ii) Patent Owner's "reliance on Dr. Goldschlag's testimony that the request message was step 5 and not the outer header." *Id.* at 48:19–49:10.

We are not persuaded by Patent Owner's arguments for either reason. First, as we discuss above, the Petition clearly sets forth that Ishiyama's request message includes the outer packet's source address. *See supra* Section VI(C) (addressing, *inter alia*, Ishiyama's Figure 4 and accompanying text).  For example, the Petition states:

---

[14] We are not suggesting that providing reasons during the oral hearing for why a new argument was made in a Sur-Reply is the appropriate procedural mechanism, if any, to excuse waiver.  Regardless, we address the merits of Patent Owner's reasons here.

[15] Patent Owner argued that it included its security flaw argument in its Sur-Reply in light of Petitioner's Reply, which explains that the request message includes the outer packet.  Tr. 47:18–48:7.

IPR2019-00819
Patent 7,620,810 B2

After the mobile terminal of Ishiyama moves from CoA1 (i.e.[,] *first* address) to CoA2 (i.e., *second* address), Ishiyama further describes the mobile terminal sending a *request message* to the address of the correspondent node (i.e[.], *security gateway*) to change the security association definition from CoA1 to CoA2. This is shown below in Figure 4 (annotated). Specifically, "the mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2'…. [T]he encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred." Ishiyama, 8:59–65.

Pet. 35. Moreover, in our Decision on Institution, when addressing the claimed request message, we noted that:

Petitioner argues that after changing addresses, mobile computer 2 sends a message (*having CoA2 for its outer packet's source address*) to correspondent host 3 via the IPSec tunnel, requesting that correspondent host 3 update to mobile computer 2's new address. [Pet. 35–37] (citing Ex. 1004, 8:59–65, 11:39–45, 12:66–13:5, Figs. 4, 7).

Dec. on Inst. 29 (emphasis added). Accordingly, we find that the Petition clearly sets forth that Ishiyama's request message includes the outer packet's source address.

Second, we disagree with Patent Owner that Dr. Goldschlag testified that "the request message is step 5 of Figure 7, *not the outer header of the message in Figure 4*." Tr. 45:10–13 (emphasis added). In support of its argument, Patent Owner referenced the following deposition testimony during the oral hearing:

Q [D]o you recall that in the [P]etitioner's analysis of Claim 1, the recited request was allegedly satisfied by the SA gateway update Operation 5 in Figure 7 of Ishiyama?

A Right. So I think that was the section that we were just looking through, that Paragraph 74 in my declaration which walks through the address change operation.

49

IPR2019-00819
Patent 7,620,810 B2

Tr. 45:14–18 (quoting Ex. 2008, 219:12–19).[16]  Patent Owner incorrectly focused on only the first word of Dr. Goldschlag's answer — "Right."  *Id.* at 45:10–18.  Dr. Goldschlag clearly includes paragraph 74 of his declaration in his answer to the question.  *Id.*  Paragraph 74, *inter alia*, annotates Figure 4 and states that it "depicts the change in the security association definition from CoA1 to CoA2."  Ex. 1002 ¶ 74 (citing Ex. 1004, 8:59–65; annotating Ex. 1004, Fig. 4).  Thus, this deposition testimony clearly does not support that Dr. Goldschlag testified that the request message does not include the outer header of the message or Figure 4's teachings.

Patent Owner also cited additional deposition testimony of Dr. Goldschlag during the oral hearing in support of its argument.  Tr. 45:7–10 (citing Ex. 2008, 219:20–220:4, 228:1–9).  For example, Patent Owner identified the following testimony:

> Q  So is it correct that the request recited in the claim is alleged to correspond to the SA update -- SA gateway update operation, Step 5 of Figure 7 of Ishiyama?
> I can refer you to the petition.
> A  Right. So the SA update operation is in Operation 5 --
> Q  Okay.
> A  -- and that's Paragraph 76 of my declaration.

Ex. 2008, 219:20–220:6.[17]  This passage supports that operation 5 of Figure 7 teaches about the claimed request message, as cited in the Petition.  *See id.*; Pet. 36–37.  It does not exclude, however, the teachings of Figure 4,

---

[16] During the oral hearing, Patent Owner read this question and the first word ("Right.") of Dr. Goldschlag's answer into the record, rather than providing the specific cite.  Tr. 45:14–18.  We here provide Dr. Goldschlag's complete answer to the question posed.

[17] Patent Owner cited only a portion of Dr. Goldschlag's answer (through line 4) to the question posed, but we here provide his answer in its entirety.

IPR2019-00819
Patent 7,620,810 B2

and its accompanying text.  *See* Ex. 2008, 219:20–220:6.  "Fig[ure] 4 is a schematic diagram for explaining operations in the case where the mobile computer changes a connected location in the mobile communication system of Fig[ure] 2" while "Fig[ure] 7 is a sequence chart showing an exemplary processing sequence in the case where the mobile computer initiates communications at a visited site and then changes a location in the mobile communication system of Fig[ure] 2."  *Compare* Ex. 1004, 5:11–13, *with id.* at 5:21–24.  In other words, Figure 4 and Figure 7 are not mutually exclusive, but rather are complementary in teaching Ishiyama's invention. *Id.*  Petitioner cites both figures in support of its arguments that Ishiyama teaches the claimed request message.  Pet. 35–37.

Moreover, paragraph 76 of Dr. Goldschlag's declaration (to which he refers in his answer) begins "Ishiyama refers to this operation as an 'SA Gateway Update,'" referring to the previous declaration paragraph 75. Ex. 1002 ¶ 76.  Paragraph 75 recites that "[t]he mobile computer 2 changes the source address of the outer packet of the encapsulated packet to be transmitted to the IPSEC tunnel by the mobile computer 2 into 'CoA2'" and that "the encapsulated packet in which the outer packet has the source address ='CoA2' will be transferred."  Ex. 1002 ¶ 75 (citing Ex. 1004, 8:59–65).  Thus, this deposition testimony clearly does not exclude the outer packet from the request message.  Ex. 2008, 219:20–220:6.  Likewise, the third passage of deposition testimony cited by Patent Owner does not exclude the outer header from the request message, but simply discusses Figure 7's teachings.  Ex. 2008, 228:1–9.

Lastly, we provide the following example from Dr. Goldschlag's deposition testimony, which Patent Owner did not cite during the oral

IPR2019-00819
Patent 7,620,810 B2

hearing but which provides further context for the cited testimony, where Dr. Goldschlag testified that the request message included the teachings of Figure 4.

> Q   And in the claim, it indicates that the request is sent from the mobile terminal to the security gateway, and you've mapped that to Operation 5 in Figure 7[?]
> A   Which is also from the mobile terminal to the security gateway, right. And if you go back to it picture, right, there is that IPsec tunnel. If you go back to Figure 4, if you don't mind.
> Q   Let's just stick with Figure 7, please.
> A   But Figure 4 will help sort of illustrate it. The mobile computer has a tunnel, and one of the purposes of the change of address is to use the same SA for the new tunnel, so it uses the new tunnel and it sends those messages over that tunnel.

Ex. 2008, 229:19–230:10.

In summary, Dr. Goldschlag's deposition testimony, taken as a whole, does not support a finding that Dr. Goldschlag stated that the request message excludes Figure 4's teachings and the use of the outer header's source address.  Ex. 2008, 219:12–220:6, 228:1–9.

Additionally, we are not persuaded by Patent Owner's argument that "Petitioner was aware of the security flaw (see March 20, 2020, deposition of Dr. Rouskas) well in advance of the Reply (filed April 1, 2020)" and chose not to address it in its Reply.  PO Sur-Reply 5 n.1; *see also* Tr. 49:24–50:6.  Again, Patent Owner does not address the security flaw argument in its Response. *See generally* PO Resp.  Thus, Petitioner correctly did not address the security flaw argument in its Reply because doing so would have been beyond the proper scope of the Reply.  *See* 37 C.F.R. § 42.23(b) ("A reply may only respond to arguments raised in the corresponding . . . patent owner response."); Consolidated Practice Guide 74.

52

IPR2019-00819
Patent 7,620,810 B2

Lastly, Patent Owner certainly was aware of its security flaw argument at least as early as March 20, 2020 when Patent Owner's expert, Dr. Rouskas, was deposed.  During this deposition, Patent Owner on redirect extensively questioned Dr. Rouskas on Ishiyama's alleged security flaw. *See* Ex. 1019, 184:6–197:22.  This occurred more than ten days before Petitioner filed its Reply on April 1, 2020.  Nonetheless, Patent Owner did not seek our authorization to supplement its Response (with a showing of good cause) during that more than ten day period or afterwards.

## VII.   ALLEGED OBVIOUSNESS OVER ISHIYAMA, MURAKAWA, AND AHONEN

Petitioner argues that the combination of Ishiyama, Murakawa, and Ahonen renders claims 2 and 3 obvious.  Pet. 59–66.  Claims 2 and 3 depend from independent claim 1, and thus, incorporate claim 1's limitations. Ex. 1001, 11:9–15.  We determine above that the combination of Ishiyama and Murakawa fails to teach a limitation of independent claim 1.  In addition, the Petition does not present any information with respect to dependent claims 2 and 3 that addresses the deficiencies discussed above regarding independent claim 1.  Pet. 59–66.  Thus, Petitioner has not demonstrated by a preponderance of the evidence that claims 2 and 3 of the '810 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama, Murakawa, and Ahonen.

## VIII.   ALLEGED OBVIOUSNESS OVER ISHIYAMA, MURAKAWA, AND  FORSLÖW

Petitioner argues that the combination of Ishiyama, Murakawa, and Forslöw renders claim 6 obvious.  Pet. 66–69.  Claim 6 depends from independent claim 1, and thus, incorporates claim 1's limitations.  Ex. 1001, 11:23–24.  We determine above that the combination of Ishiyama and

IPR2019-00819
Patent 7,620,810 B2

Murakawa fails to teach a limitation of independent claim 1. In addition, the Petition does not present any information with respect to dependent claim 6 that addresses the deficiencies discussed above regarding independent claim 1. Pet. 66–69. Thus, Petitioner has not demonstrated by a preponderance of the evidence that claim 6 of the '810 patent would have been obvious to one of ordinary skill in the art in view of Ishiyama, Murakawa, and Forslöw.

IX.    CONCLUSION[18]

Based on the full record before us, we determine that Petitioner has not demonstrated by a preponderance of the evidence that claims 1–6 of the '810 patent are unpatentable under 35 U.S.C. § 103(a) for any of the asserted grounds. We also determine that Petitioner has demonstrated by a preponderance of the evidence that claim 7 of the '810 patent is unpatentable under 35 U.S.C. § 103(a) over Ishiyama and Murakawa.

| Claim(s) | 35 U.S.C § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 4, 5, 7, | 103(a) | Ishiyama, Murakawa | 7 | 1, 4, 5 |
| 2, 3 | 103(a) | Ishiyama, Murakawa, Ahonen | | 2, 3 |

---

[18] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2019-00819
Patent 7,620,810 B2

| 6 | 103(a) | Ishiyama, Murakawa, Forslöw | | 6 |
|---|---|---|---|---|
| **Overall Outcome** | | | 7 | 1–6 |

## X.   ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), Petitioner has not shown by a preponderance of the evidence that claims 1–6 of the '810 patent are unpatentable;

FURTHER ORDERED that Petitioner has shown by a preponderance of the evidence that claim 7 of the '810 patent is unpatentable; and

FURTHER ORDERED that parties to the proceeding seeking judicial review of this Final Written Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2019-00819
Patent 7,620,810 B2

PETITIONER:

Michael D. Specht
Daniel S. Block
Timothy L. Tang
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
mspecht-ptab@sternekessler.com
dblock-ptab@sternekessler.com
ttang-ptab@sternekessler.com


PATENT OWNER:

James T. Carmichael
Stephen Schreiner
CARMICHAEL IP LAW, PLLC
jim@carmichaelip.com
schreiner@carmichaelip.com


Christopher J. Lee
Richard B. Megley
Brian E. Haan
Ashley E. LaValley
LEE SHEIKH MEGLEY & HAAN LLC
clee@leesheikh.com
rmegley@leesheikh.com
bhaan@leesheikh.com
alavalley@leesheikh.com


Kenneth J. Weatherwax
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

IPR2019-00819
Patent 7,620,810 B2